824 So.2d 1137 (2002)
Alfred AUSTIN, et al.
v.
ABNEY MILLS, INC. et al.
No. 2001-C-1598.
Supreme Court of Louisiana.
September 4, 2002.
Rehearing Denied September 23, 2002.
*1139 John F. Dillon, New Orleans, Juan A. Tramontana, Bruscato, Tramontana & Wolleson, Monroe, Donni E. Young, Scott C. Taylor, Paul Benton, Ness, Motley, Loadholt, Richardson & Poole, Barnwell, SC, Robert E. Arceneaux, New Orleans, Counsel for Applicant.
Kay B. Baxter, David A. Barfield, Gaye Nell Lott Currie, Jackson, MS, Arthur W. Stout, III, Deutsch, Kerrigan & Stiles, William C. Ellison, Joell M. Keller, William J. Hamlin, Bordelon, Hamlin & Theriot, Jonathan M. Herman, Crull, Castaing & Lilly, Dwight C. Paulsen, III, Lemle & Kelleher, New Orleans, Jeffrey P. Hubbard, Peter L. Doran, Jackson, MS, Donald J. Miester, Jr., New Orleans, Charles V. Giordano, Miranda, Warwick & Milazzo, Metairie, Mickey P. Landry, Baton Rouge, Frank J. Swarr, New Orleans, Landry & Swarr, Counsel for Respondent.
Julie A. Ardoin, Scott R. Bickford, Stephen B. Murray, John R. Martzell, Christopher H. Sherwood, Joseph A. Race, New Orleans, Counsel for Murray Law Firm, Martzell & Bickford (Amicus Curiae).
Mickey P. Landry, Baton Rouge, Frank J. Swarr, New Orleans, Counsel for Victor D. Carlock, Sr. (Amicus Curiae).
Jules K. Boudreaux, Houma, Perry J. Roussel, Jr., Gerolyn P. Roussel, La Place, Counsel for Roussel & Roussel (Amicus Curiae).
Mickal P. Adler, Brian C. Bossier, Metairie, Marc E. Devenport, Kenner, Erin H. Boyd, Metairie, Counsel for Avondale Industries, Inc. (Amicus Curiae).
Nancy Picard, Robert H. Urann, Metairie, Counsel for Louisiana State Bldg. & Construction Trades (Amicus Curiae).
Brian F. Blackwell, Steven M. Jupiter, Jena S. LeBlanc, Cameron R. Waddell, Jules B. LeBlanc, IV, Baton Rouge, Counsel for Louisiana AFL/CIO (Amicus Curiae).
Denis P. Juge, Metairie, Counsel for Louisiana Association of Business and Industry (Amicus Curiae).
Kaye N. Courington, Leigh A. Schell, New Orleans, Counsel for Hopeman Brothers, Inc. (Amicus Curiae).
Johanna G. King, Gary A. Lee, New Orleans, Counsel for Peter Territo, Steven Kennedy (Amicus Curiae).
David M. Bienvenu, Jr., Jennifer M. Sigler, William S. McKenzie, John R. Tharp, Baton Rouge, Counsel for Ethyl Corporation.
Gregory M. Anding, Scott D. Johnson, Gayla M. Moncla, Barrye P. Miyagi, Robert E. Dille, Gary A. Bezet, Baton Rouge, Counsel for Exxon Mobile Corporation, Texaco Inc., Chevron Chemical Co., BASF Corporation, and Georgia Pacific Corp. (Amicus Curiae).
CALOGERO, Chief Justice.[*]
The plaintiff, Mr. Alton Hogue, suffers from malignant pleural mesothelioma, a long-latency asbestos-related disease, which he alleges was caused by excessive exposure to asbestos and asbestos-containing materials during his employment with International Paper Company and Arizona Chemical Company from 1955 to 1998. Mr. Hogue filed a tort suit under La. Civ.Code art. 2315 against his employers and unnamed executive officers. The defendants moved for summary judgment invoking immunity under La. Rev. Stats. 23:1031.1 and 23:1032. The district court *1140 granted summary judgment in favor of the defendants, and the court of appeal affirmed, albeit on different grounds. We granted the writ application to review the correctness of those rulings. For the reasons set forth below, we adopt the significant exposure theory articulated in Cole v. Celotex, 599 So.2d 1058 (La.1992), for fixing the date of accrual for a cause of action under La. Civ.Code art. 2315 in a long-latency occupational disease case in which the plaintiff suffers from the disease. Applying that test to determine the applicable law, we conclude that the defendants are not entitled to summary judgment as a matter of law and remand the matter for further proceedings.

I.
Mr. Hogue was employed by International Paper Company from 1955 to 1960, and thereafter until his retirement in 1998 by Arizona Chemical Company. In December 1998, Mr. Hogue was diagnosed as having malignant pleural mesothelioma, which he alleges was caused by exposure to asbestos and asbestos-containing materials during the course of his employment with both companies. On December 30, 1997, Mr. Hogue and his wife, Betty, along with a large group of other similarly-situated plaintiff's who claim they have contracted a variety of asbestos-related diseases, filed suit against numerous asbestos manufacturers and suppliers, asserting claims in negligence, intentional tort, and fraud. On July 20, 1999, Mr. Hogue amended his petition to add as defendants his former employers, International Paper Company and Arizona Chemical Company, as well as unnamed directors and executive officers of the companies (herein referred to as "the employer defendants"), stating claims in negligence and intentional tort. In his petition, Mr. Hogue alleges that during his employment with the employer defendants, he suffered excessive exposure to asbestos and asbestos-containing materials that caused him injuries.

II.
In 1952, the legislature provided for the coverage of occupational diseases under Louisiana's workers' compensation law. La.Rev.Stat. 23:1031.1(A) (1952). The statute defined "occupational disease" by identification, stating in part that "[a]n occupational disease shall include only those diseases hereinafter listed when contracted by an employee in the course of his employment as a result of the nature of the work performed." La.Rev.Stat. 23:1031.1(A) (1952) (emphasis added). This "exclusive list," as we observed in O'Regan v. Preferred Enterprises, Inc., 98-1602, p. 6 (La.3/17/00), 758 So.2d 124, 129 (on rehearing), included diseases caused by contact with specific substances, namely the diseases of contact poisoning from enumerated sources, asbestosis, silicosis, dermatosis, and pneumoconiosis. La.Rev.Stat. 23:1031.1(A) (1952). In 1958, by Acts 1958, No. 39, the legislature added tuberculosis as one of the specified occupational diseases for certain hospital workers. La.Rev.Stat. 23:1031.1(A) (1958). Although the 1952 and 1958 enactments listed specific occupational diseases, in 1975 by Acts 1975, No. 583, § 2, the legislature revised La.Rev.Stat. 23:1031.1(A) by removing the list of specific diseases for which there was coverage under workers' compensation and substituting the following definition:
An occupational disease shall mean only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease.
The parties do not dispute that La.Rev. Stat. 23:1031.1(A) since the 1975 amendment *1141 thereto would include mesothelioma as an occupational disease covered by the Louisiana workers' compensation law.
Additionally, La.Rev.Stat. 23:1032 provides that workers' compensation benefits are the exclusive remedy of an employee for an injury or compensable sickness or disease arising out of and in the course of employment, except for those resulting from intentional acts. In 1976, the legislature amended La.Rev.Stat. 23:1032 to extend statutory immunity from tort liability to "any officer, director, stockholder, partner, or employee" of the employer.[1]

III.
In February 2000, the employer defendants filed a motion for summary judgment claiming they have immunity from tort liability under La. Rev. Stats. 23:1031.1 and 23:1032. In their memorandum accompanying the motion, the employer defendants specifically allege that the cause of action for, and the right to, workers' compensation benefits is governed by the date of disability. Thus, they argue that once an employee has a disability caused by a disease contracted as a result of his employment, the workers' compensation law provides his exclusive remedy, and the employer's tort immunity follows. The employer defendants point out that the workers' compensation law makes no reference to when a disease is contracted, only that it be contracted, and contraction is not defined. The employer defendants allege that Mr. Hogue's cause of action for workers' compensation benefits arose when he became disabled in 1998 and, therefore, his cause of action for benefits did not exist prior to the 1975 change in La.Rev.Stat. 23:1031.1. They assert that, because Mr. Hogue's cause of action for workers' compensation benefits arose after the effective date of La.Rev.Stat. 23:1031.1, he is limited to recovery of workers' compensation benefits, and the employers have complete immunity. In support of their motion, the defendants submitted a medical report indicating that Mr. Hogue was diagnosed with mesothelioma in December of 1998 and that he first experienced symptoms of the disease in July 1998, when he ceased working due to disability.
In his opposition to the employer defendants' motion, Mr. Hogue asserts that the law that governs this case of latent occupational disease is the law in effect when the injury-producing exposures occur, citing Cole v. Celotex, supra, that the pre-1975 workers' compensation laws apply to this case of mesothelioma because injury-producing exposures to asbestos occurred prior to 1975, and, therefore, the subsequent legislative changes to La.Rev.Stat. 23:1031.1 or 23:1032 cannot be applied to abrogate Mr. Hogue's vested rights, see Walls v. American Optical Corp., 98-0455 (La.09/08/99), 740 So.2d 1262. In opposing the motion, Mr. Hogue presented employment records and a portion of his deposition in which he discussed his job duties and exposure to asbestos. He also included the affidavit of Dr. Victor Roggli, a board-certified pathologist who had reviewed the medical records and Mr. Hogue's deposition. Dr. Roggli concluded that Mr. Hogue suffers from malignant pleural mesothelioma, well-differentiated papillary epithelial variant, caused by exposure to asbestos. He stated that mesothelioma caused by occupational asbestos exposure is a disease that typically requires twenty years between the first exposure and its appearance upon diagnosis, *1142 that each exposure is cumulative in its effect, and that there is no known safe level of exposure to asbestos with respect to the development of mesothelioma. According to Dr. Roggli, Mr. Hogue's exposures through the 1950s, 1960s, and 1970s satisfy the requirements to relate these asbestos exposures to his diagnosis of mesothelioma.
The district court ruled in favor of the employer defendants, holding that the date of disability determines an employee's right to workers' compensation benefits and that, because Mr. Hogue became disabled in 1998, when he was diagnosed and by which time mesothelioma was a covered occupational disease, he was precluded from all tort actions for injuries compensable under the workers' compensation law.
The court of appeal amended the judgment to dismiss only Mr. Hogue's negligence tort claims because the intentional tort claims are not barred by the workers' compensation law, and, as so amended, affirmed summary judgment in favor of the employer defendants. Austin v. Abney Mills, Inc., 34,495 (La.App. 1 Cir. 4/4/01), 785 So.2d 177. Although the court of appeal found that the employer defendants were entitled to summary judgment, it did so on grounds different from those articulated by the district court, and implicitly rejected the reasoning asserted by the employer defendants and adopted by the district court.
The court of appeal framed the question presented by the defendants' motion as "whether or not Hogue's cause of action in tort `vested' prior to the inclusion of mesothelioma in the workers' compensation law in 1975." Austin v. Abney Mills, Inc., 34,495, p. 5, 785 So.2d at 181. The court of appeal acknowledged that "the general principle is that statutes enacted after the acquisition of a vested property right cannot be applied retroactively so as to divest the plaintiff of his cause of action without violating due process guarantees." Id., citing Cole. Nonetheless, the court of appeal refused to apply the tortious exposure theory set forth in Cole to determine whether Mr. Hogue's cause of action in tort had vested before the 1975 change in the workers' compensation law. The court reasoned that "exposure," as commonly understood in the context of disease, does not include the concept of damages, and without damages Mr. Hogue had no cause of action prior to 1975. The court of appeal declined to determine whether it is the manifestation theory or the contraction theory that must be applied to these facts; instead, it found that Mr. Hogue had failed to raise a material issue of fact under either theory. The court found that the medical report introduced by the employer defendants, which indicated that Mr. Hogue was experiencing symptoms of the disease in July 1998, was sufficient to point out the absence of factual support for a claim that Mr. Hogue contracted the disease prior to 1975. The court noted that, under the manifestation theory, Mr. Hogue had presented no factual support that his cause of action had vested prior to 1975, because he had failed to present evidence refuting the fact that the mesothelioma was not diagnosed or manifested until July 1998. Under the contraction theory, the court noted, Mr. Hogue's evidence was insufficient to establish that he would be able to satisfy his burden of proving that he had contracted mesothelioma prior to 1975, because Dr. Roggli did not indicate that Mr. Hogue had sustained injury, latent or otherwise, before 1998. The court further noted that Dr. Roggli's "generic conclusions ... failed to establish even a hint of specific injury ... prior to 1975." 34,495, p. 9, 785 So.2d at 183. Thus, the court of appeal found no error in the dismissal of Mr. Hogue's negligence claims.
*1143 We granted the writ application to determine whether summary judgment in favor of the employer defendants was appropriate.

IV.
Appellate review of the granting of a motion for summary judgment is de novo. Schroeder v. Bd. of Sup'rs of La. State Univ., 591 So.2d 342 (La.1991). A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ. Proc. art. 966(B). La.Code Civ. Proc. art. 966(C)(2) states the burden of proof in summary judgment proceedings, providing:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
See also Maraist & Lemmon, Louisiana Civil Law Treatise: Civil Procedure, § 6.8 (1999).
In this case, the employer defendants invoke statutory employer immunity under La.Rev.Stat. 23:1032, which we said in Walls, is a special or affirmative defense that the employer bears the burden of proving at trial. Walls, 98-0455, p. 6, 740 So.2d at 1267, citing La.Code Civ. Pro. art. 1005; Berry v. Holston Well Serv., Inc., 488 So.2d 934 (La.1986). At any rate, to prevail in their motion for summary judgment, the employer defendants must, in addition to showing that there are no genuine issues of material fact, establish the applicable law governing the issue raised and that they are entitled to summary judgment as a matter of law. See Maraist & Lemmon, supra, § 6.8, p. 145.

V.
We first address the argument presented by the employer defendants in support of their motion for summary judgment. For the reasons that follow, we conclude that the date of disability is not the relevant date to decide the issue of when a tort cause of action under La. Civ.Code art. 2315 accrues in a long-latency occupational disease case in which the individual suffers from the disease. Thus, although the defendants may have established that there is no genuine dispute surrounding the date of disability, they have failed to establish that the date of disability is a material fact under the law applicable to this case.
In the instant case, the employer defendants have submitted in support of their motion a document entitled "Long-Term DisabilityAttending Physician's Statement," signed and apparently completed by Robert C. Holladay, M.D. This document indicates that Mr. Hogue's symptoms first appeared in July of 1998 and that he ceased working because of disability that same month. The document, dated December 2, 1998, also indicates that Mr. Hogue is diagnosed with malignant mesothelioma, that he is totally disabled from performing any manual labor or walking, *1144 and that there is no prognosis for future fundamental or marked change. Nowhere in the affidavits submitted in support of or in opposition to the motion for summary judgment, nor in the pleadings, depositions, answers to interrogatories, or admissions on file present in the record, is there any indication that Mr. Hogue became disabled before 1998. Thus, it would appear that there is no genuine controversy regarding the date Mr. Hogue became disabled.
However, the employer defendants must show that the date of disability is a fact material to the resolution of the case; in other words, they must establish that, under the applicable law governing the issue raised, they are entitled to summary judgment as a matter of law. See Maraist & Lemmon, supra, § 6.8, p. 145. In this case, the employer defendants maintain that the date of disability determines when the employee's cause of action for workers' compensation benefits accrues, that Mr. Hogue became disabled from mesothelioma in 1998 when the disease was a covered occupational disease under La.Rev.Stat. 23:2031.1, that he was entitled to workers' compensation benefits, and that the employer defendants were immune from a suit in tort under the workers' compensation law. In their argument to this court, the employer defendants assert that, pursuant to the quid pro quo doctrine underlying the Louisiana workers' compensation scheme, once the employee becomes entitled to seek workers' compensation benefits, his remedy is exclusively that of workers' compensation, and the employers enjoy immunity from any suit in tort.
We find that this argument misperceives the precise legal question presented in this case by the defendants' invocation of employer immunity. First, Mr. Hogue is not seeking workers' compensation benefits, so the cases relied on by the employer defendants for the premise that the date of disability determines eligibility for workers' compensation benefits are inapposite. See, e.g., LaCoste v. J. Ray McDermott & Co., 250 La. 43, 193 So.2d 779 (1967); Chivoletto v. Johns-Manville Products Corp., 330 So.2d 295 (La.1976); Schouest v. J. Ray McDermott, 411 So.2d 1042 (La.1982); White v. Johns-Manville Sales Corp., 416 So.2d 327 (La.App. 5th Cir.1982).
Second, the employer defendants' reliance on the plurality opinion in O'Regan v. Preferred Enterprises, Inc., 98-1602 (La.3/17/00), 758 So.2d 124 (on rehearing), and language therein to support their argument that the legislature intended by amending La.Rev.Stat. 23:1031.1 in 1975 to cover additional occupational diseases and that the cause of action arises upon disability is misplaced.[2] In this court, the employer defendants argue that quid pro quo requires that, once the employee becomes eligible for workers' compensation benefits, his exclusive remedy lies within the workers' compensation law and the employer is entitled to immunity from suit in tort. Yet, the conception of quid pro quo underlying the workers' compensation law is that of a compromise in which the employer *1145 surrenders immunity from liability, which he would otherwise be entitled to in cases wherein he was without fault, and, in return, the employee foregoes his right to full damages for his injury in exchange for limited but certain compensation. See Thomas v. State, Dept. of Transp. and Dev., 27,203 (La.App. 2 Cir. 10/12/95), 662 So.2d 788; Malone & Johnson, Workers' Compensation Law and Practice, 14 Louisiana Civil Law Treatise § 361, pp. 149-50 (West 1994). Although the employer defendants assert that the 1975 amendment to La.Rev.Stat. 23:1031.1 was intended simply to "expand" coverage for occupational diseases, the fact remains that it is well-established in our law that an individual cannot be divested of an accrued property right by subsequent legislative action. As we explained in Walls:
"Once a party's cause of action accrues, it becomes a vested property right that may not constitutionally be divested." Cole v. Celotex, 599 So.2d at 1063 (citing Crier v. Whitecloud, 496 So.2d 305, 308 (La.1986); Faucheaux v. Alton Ochsner Med. Found. Hosp. & Clinic, 470 So.2d 878, 879 (La.1985); Lott v. Haley, 370 So.2d 521, 524 (La.1979); Burmaster v. Gravity Drainage Dist. No. 2, 366 So.2d 1381, 1387 (La.1978); Marcel v. Louisiana State Dep't of Public Health, 492 So.2d 103, 109-10 (La.App. 1st Cir.), writ denied, 494 So.2d 334 (La.1986)). Therefore, "statutes enacted after the acquisition of such a vested property right ... cannot be retroactively applied so as to divest the plaintiff of his vested right in his cause of action because such a retroactive application would contravene the due process guaranties." Cole v. Celotex, 599 So.2d at 1063 (quoting Faucheaux, 470 So.2d at 879).
Walls, 98-0455, p. 8, 740 So.2d at 1269. See 2 A.N. Yiannopoulos, Louisiana Civil Law Treatise, § 10 (3d ed. 1991) ("Retroactive application of new legislation is constitutionally permissible only if it does not result in impairment of the obligation of contracts or in divesture of vested rights."); see also Logan v. Zimmerman Brush Co., 455 U.S. 422, 428-29, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), and Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (holding that a state tort claim is a species of property protected by the due process clause); Anderson v. Avondale Indus., Inc., 00-2799, p. 6 (La.10/16/01), 798 So.2d 93, 99 ("Once a cause of action accrues, a party has a vested right in the cause of action that a new substantive law cannot take away.").
Although the employer defendants seemingly argue to the contrary, this general rule applies in the context of workers' compensation and occupational diseases as well. Where the act provides no coverage for an occupational disease, the employee enjoys no compensating advantage for the surrender of any tort rights he might have; therefore, he is free to proceed against his employer in tort. See Malone & Johnson, supra, § 361, p. 151 (West 1994). Thus, if the employee acquires a right to sue in tort for a non-covered occupational disease, he cannot later be divested of that right by subsequent legislative expansion of coverage for occupational disease. The Fourth Circuit recently upheld that principle when it held that, because the pre-1975 version of La. Rev.Stat. 23:1031.1 did not include mesothelioma as a covered disease or asbestos as a substance that caused disease, the plaintiffs were not precluded from pursuing a negligence action against their employer. Callaway v. Anco Insulation, Inc., 98-0397 (La.App. 4 Cir. 3/25/98), 714 So.2d 730, writ denied, 98-1034 (La.11/19/99), 749 So.2d 666.
Because whether mesothelioma was a covered disease prior to 1975 is not at issue here, the court of appeal correctly *1146 recognized the issue presented as whether Mr. Hogue's cause of action for mesothelioma accrued prior to 1975. Accordingly, we have squarely before us the issue of what theory is applicable to fix the time when the tort cause of action arises in a long-latency occupational disease case wherein the plaintiff has developed the disease, so as to determine the applicable law: whether it be the "significant tortious exposure" theory we enunciated in Cole, but which was rejected by the lower courts in this case, or a so-called "manifestation" theory, articulated by the court of appeal, or the "contraction" theory, which, as we have previously stated, may be inherently difficult to apply in long-latency occupational disease cases.
In that regard, the employer defendants assert that the "significant tortious exposure" theory articulated in Cole is not an acceptable legal theory under which to determine when Mr. Hogue's cause of action arose. The court of appeal, by contrast, reasoned that "manifestation" of the disease can determine the date of the applicable workers' compensation law. As there appears to be no factual dispute that the mesothelioma cancer did not "manifest" itself until 1998, or that Mr. Hogue became "disabled" in 1998 for purposes of the workers' compensation law, we are confronted with whether the lower courts were correct in rejecting the "significant tortious exposure" theory of Cole for determining the date of accrual of the cause of action in a long-latency occupational disease case.

VI.
As noted above, La.Rev.Stat. 23:1031.1 was amended in 1975 by Acts 1975, No. 583, § 2 to define an occupational disease. Nothing in the language of Act 583, which became effective on September 1, 1975, indicates that it should be applied either prospectively or retroactively. Similarly, Act 147 of 1976, amending La.Rev. Stat. 23:1032, is silent as to prospective or retroactive application. However, as we acknowledged in Cole, "[p]rospective operation of statutes is a general rule and, as a general rule, it is respected by the courts." 599 So.2d at 1063 (quoting Dixon, Judicial Method in Interpretation of Law in Louisiana, 42 La. L.Rev. 1661, 1665 (1982)); see also Walls, 98-0455, p. 13, n. 12, 740 So.2d at 1272, n. 12. As we noted in Walls, this general rule is codified in La. Civ.Code art. 6, which also provides the exceptions thereto:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
See also La.Rev.Stat. 1:2 (stating that no statute therein may be applied retroactively unless it is expressly so stated). Planiol explains the rationale behind such a rule:
New laws should not have a retroactive effect because a fact and an act are governed by the law under whose aegis they took place, and because the solution cannot change on account of the circumstance that when the court rules, the law governing such a fact and act is no longer the same.
1 M. Planiol, Treatise on the Civil Law, sec. 243A (La.St.L.Inst.Trans.1959).
In Walls, we utilized an analytical framework wherein the court first determines whether a statute actually operates retroactively when applied in a particular case, and, if so, the court then turns to the twofold inquiry under La. Civ.Code art. 6 to determine whether the' new statute comes within the exceptions to the rule of prospective application and thereby permissively operates retroactively.[3] *1147 Walls, 98-0455, p. 13, n. 12, 740 So.2d at 1272, n. 12. To determine whether a statute operates retroactively, the court adopted the test articulated by Planiol:
A law is retroactive when it goes back to the past either to evaluate the conditions of the legality of an act, or to modify or suppress the effects of a right already acquired. Outside of those conditions, there is no retroactivity.
Planiol, supra, sec. 243.
We find the issue before us can be decided on the second situation identified by Planiol, whether the law modifies or suppresses the effects of a right already acquired. If it is determined that Mr. Hogue's cause of action accrued prior to the 1975 and 1976 changes in the law, then restricting his remedy to workers' compensation and immunizing his employer and its executive officers would certainly modify or suppress the effect of any already-acquired tort cause of action.[4] Accordingly, as the court of appeal correctly recognized, we must decide what legal theory or theories govern the determination of when Mr. Hogue acquired his tort cause of action in this long-latency asbestos-related disease context.[5]

*1148 VII.
Under Louisiana law, for a negligence cause of action to accrue, three elements are required: fault, causation and damages. Owens v. Martin, 449 So.2d 448 (La.1984) (citing Seals v. Morris, 410 So.2d 715, 718 (La.1982)); Weiland v. King, 281 So.2d 688 (La.1973). In Cole, we recognized that, although "a sine qua non for accrual of a cause of action is damages, ... `Louisiana is generous in its conception of damages, the slightest being sufficient to support an action.'" 599 So.2d at 1063, n. 15 (quoting Ferdinand F. Stone, Tort Doctrine, 12 Louisiana Civil Law Treatise, § 12 (1977)). More recently in Bourgeois v. A.P. Green Industries, Inc., 97-3188 (La.7/8/98), 716 So.2d 355 (Bourgeois I), we stated that, "[w]hile a `mere invasion' of an interest is insufficient to support a cause of action, an invasion that brings about some degree of loss or detriment and is capable of repair is the type of consequence envisioned under Article 2315." 97-3188, p. 3, 716 So.2d at 357-58 (citing Stone, supra, § 12). Furthermore, a cause of action may arise before a plaintiff sustains all of the damages occasioned by the defendant's negligence. Harvey v. Dixie Graphics, 593 So.2d 351 (La.1992).
We initially reject the court of appeal's application of a so-called "manifestation" theory to determine when Mr. Hogue's cause of action accrued. First, without any analysis, the court of appeal ostensibly defines "manifestation" as exhibiting symptoms of the disease such that the individual is disabled and cannot work. Austin, 34,495, p. 7, 785 So.2d at 182. The court of appeal apparently derived this definition of "manifestation" from the medical report submitted by the employer defendants, which indicates that Mr. Hogue was diagnosed with mesothelioma cancer in December 1998, but that he was experiencing symptoms of the disease in July 1998 when he ceased working due to disability. The court of appeal concludes from this report that the disease "manifested" itself in July 1998, and thereby seemingly defines "manifestation" as more than the exhibition of symptoms. Second, the court of appeal's reasoning that compensable injury or damage does not occur unless and until the disease "manifests" itself is myopic, because it cannot be reasonably disputed that Mr. Hogue suffered compensable injury or damage at some earlier date, such as when he contracted the disease or when the exposures to as-bestos were such that the disease process had commenced. Certainly at such an earlier stage, the disease would have been more "capable of repair," as Justice Marcus contemplates in Bourgeois I, 97-3188, p. 3, 716 So.2d at 357-58, than when the disease later "manifests" itself by rendering the worker disabled. Third, we previously rejected application of the "manifestation" theory to determine when a tort cause of action accrues in a long-latency, asbestos-related occupational disease case in Bourgeois I, supra.[6]
*1149 Furthermore, the adoption of a "manifestation" theory in cases wherein the individual suffers from the disease effectively circumvents the due process prohibition of divesting a person of a vested property right. This is because applying "manifestation" of a long-latency occupational disease in a case where the plaintiff suffers from the disease to fix the date that a cause of action in tort accrues ignores reality in that compensable, tortious injury or damage to the plaintiff has certainly occurred at an earlier date. Thus, it would be a dangerous precedent to adopt manifestation or diagnosis of the disease as the relevant date for fixing the accrual of the tort cause of action, because to do so could destroy the vested rights of individuals in other cases where the damage does not manifest itself until some later time even though the tortious injury has been previously, but unknowingly, sustained.
Moreover, equating the accrual of the tort cause of action with manifestation or diagnosis of the disease will have a negative and serious impact on the role of prescription and the doctrine of contra non valentem in Louisiana law.[7] The *1150 court of appeal by applying such a theory essentially adopted a "discovery rule" for the accrual of a cause of action, a concept foreign to Louisiana tort law. Despite the perceived difficulties in proving the onset of a long-latency disease such as mesothelioma, we find no need for such a radical departure from well-settled legal principles.
We now turn to the "contraction" theory and the "significant tortious exposure" theory, which, though they differ to some extent, are logically related. Prior to our decision in Cole, the Fourth Circuit in Faciane v. Southern Shipbuilding Corp., 446 So.2d 770, 773 (La.App. 4th Cir.1984), enunciated a contraction theory for determining when injury is deemed to occur in long-latency occupational disease cases, deeming injury to occur when "the cumulation of exposure reache[s] the point where the plaintiff contract[s] the disease." More specifically, in Faciane, supra, a silicosis case, the Fourth Circuit explained the contraction theory as follows:
It seems implicit from much of the medical evidence that once silica dust has so damaged and maimed the body that the fibrogenic effects of silica inhalation will progress independent of further exposure, a disease has been contracted. It is at this point and not before that the consequences of exposure to silica becomes inevitable and in our opinion, actionable. The victim's body has been injured just as surely as if it had been hit by a truck.
446 So.2d at 773. In Faciane, supra, an executive officer suit, this theory was crafted to resolve the issue of when the plaintiff's cause of action accrued for purposes of determining the applicable law, because the suit was filed after the adoption of the 1976 amendment to the compensation laws eliminating executive officer suits, but the plaintiff contended that his cause of action had arisen before that amendment. In this context, other Louisiana courts have likewise suggested that a contraction theory may be the appropriate rule. See Owens v. Martin, 449 So.2d 448 (La.1984); Lebleu v. Southern Silica of La., 554 So.2d 852, 855 (La.App. 3rd Cir. 1989), writ denied, 559 So.2d 489 (La. 1990); Quick v. Murphy Oil Co., 446 So.2d 775 (La.App. 4th Cir.1982), writ denied, 447 So.2d 1074 (La.1984). But the Cole court recognized that the contraction theory is "fraught with difficulties" because "`it is extremely difficult to accurately fix the point in time at which the disease is contracted.'" 599 So.2d at 1076, n. 54 (quoting Faciane, 446 So.2d at 773). "Due to these inherent difficulties," the Cole court declined the invitation to invoke this theory to determine the trigger or timing of insurance coverage for a "bodily injury." The Cole court "[left] for another day ... resolution of the continued viability of the contraction theory in the context in which it arose," i.e., immunity from tort liability under the workers' compensation law. We are confronted with the precise issue here.
While the Cole court may not have answered the question presented to us in the instant case, it did set out a framework for determining when a cause of action accrues in long-latency occupational disease cases, i.e., the significant tortious exposure theory, especially when the individual suffers from the disease and the court must determine the applicable law. This fact was recognized by the court in Walls, which clearly stated that "Cole established the `exposure theory' for determining the applicable law within the context of the direct tort action and survival action." 98-0455, p. 14, 740 So.2d at 1273. The Walls *1151 court, in examining when a cause of action under La. Civ.Code art. 2315.2 for wrongful death accrues, held that the plaintiff's injury in a wrongful death action occurs at the moment of the victim's death and, therefore, the cause of action in favor of decedent's survivors does not accrue until that moment. 98-0455, pp. 9-10, 740 So.2d at 1270. Furthermore, the Walls court declined to apply the "exposure theory" to a wrongful death case in which the exposure occurred before the 1976 amendment to Rev. Stat. 23:1032 but the decedent died after the effective date of the amendment, reasoning that the survival and wrongful death actions "are totally separate and distinct causes of action that arise at different times and allow recovery of completely different damages." 98-0455, p. 14, 740 So.2d at 1273. Still, the point was made in Walls that Cole's significant tortious exposure theory more logically governs the accrual of a direct tort action in long-latency occupational disease cases, as the Walls court, too, recognized the difference between the ordinary tort case and long-latency disease cases, because "the injury producing conduct and the resulting injury or damage usually occur contemporaneously" in the former, whereas in the latter, "the damage does not manifest itself for many years following the conduct from which it arose." 98-0455, p. 10, 740 So.2d at 1270.[8] Thus, we turn to Cole to examine the analytical framework established therein.
In Cole, we recognized that cases arising from occupational exposures present peculiar difficulties in determining when an injured plaintiff's cause of action accrues.
The difficulties in asbestosis cases arise because, unlike in traditional personal injury cases in which the damage results from a single, identifiable act causing traumatic injury, in asbestosis cases the damage results from a continuous process a slow development of this hidden disease over the years. Compounding the problem, asbestosis cases are characterized by a lengthy latency period typically ranging a decade or twoand, consequently, a lengthy temporal separation between the tortious conduct and the appearance of injury. This lengthy latency period renders efforts to pinpoint the date on which the disease was contracted virtually impossible, medically and legally. Further, this inability to pinpoint when injuries were sustained in asbestosis cases renders determining the date on which a plaintiff's cause of action accrued a herculean task.
Cole, 599 So.2d at 1065 (internal citations omitted).[9]
Cole involved the claims of three employees suffering from injuries caused by long-term exposure to asbestos who sued *1152 the executive officers of their employer for failure to provide them with a safe work-place. We were required to decide whether Act 431, which ushered in the modern comparative fault system, applied to the case when the employees' exposures occurred during pre-comparative fault law, while their diseases did not manifest until after the change in the law. In Cole, we found:
[T]he key relevant events giving rise to a claim in long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later. We further conclude that when the tortious exposures occurring before Act 431's effective date are significant and such exposures later result in the manifestation of damages, pre-Act law applies.
Cole, 599 So.2d at 1066. Since the Cole plaintiffs' exposures occurred under pre-Act law, we held that pre-comparative fault law should apply under the facts of that case.
Since our ruling in Cole, a number of Louisiana appellate cases have applied its reasoning to long-latency disease tort cases involving laws other than comparative fault, such as workers' compensation, products liability, and prescription. See, e.g., Callaway, supra; Pitre v. GAF Corp., 97-1024 (La.App. 1 Cir. 12/29/97), 705 So.2d 1149, writ denied, 98-0723 (La.11/19/99), 749 So.2d 666; Young v. E.D. Bullard Co., 97-657 (La.App. 5 Cir. 11/25/97), 703 So.2d 783, writ denied, 98-0457 (La.11/19/99), 749 So.2d 665; Thomas, supra. Some courts have observed that Cole called into question the viability of the contraction theory as a method for determining the accrual of a cause of action in long-latency disease cases. See, e.g., Abadie v. Metropolitan Life Ins. Co., 00-344 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, writ denied, 01-1543 (La.12/14/01), 804 So.2d 643.
It has been argued that Cole should be restricted to its facts, because we were ultimately only called upon to determine what the term "events" meant under Act 431 and not what constitutes injury or damage in a long-latency occupational disease case. However, such an argument ignores our rationale in that case. In both parts of the Cole opinion where we discussed "injury or damage" under the traditional tort analysis for accrual of a cause of action and "bodily injury" for purposes of triggering insurance coverage, we clearly envisioned that the concept of "significant tortious exposure" in long-latency occupational disease cases could include the concept of injury or damage giving rise to a tort cause of action.
In discussing the meaning of "events" as used in Act 431, we noted that Louisiana courts equate the term with the traditional tort concepts of "accident" and "injury" to hold that, when the accident and the injury occurred before Act 431's effective date, pre-Act law applies. 599 So.2d at 1065 (citing McDermott v. Jester, 466 So.2d 795 (La.App. 4th Cir.), writ denied, 468 So.2d 576 (La.1985)). We did not disapprove of such reasoning with regard to traditional torts; instead, we found that such reasoning was too problematic to apply to long-latency occupational disease cases. 599 So.2d at 1065. While we acknowledged that "the requisites for asserting a cause of action are `a wrongful act and resulting damages,'" we found that such concepts are "designed for handling traditional tort suits, and [are] inept for identifying the key `events' giving rise to a cause of action for long-term exposure to asbestos in the workplace." Id. We then stated:
The uniqueness of asbestosis cases and the difficulties of trying to fit such *1153 cases within the framework of concepts designed to handle traditional torts has been recognized: "`the factual predicate giving rise to potential liability from asbestos exposure is simply different from those that generated most tort doctrines... [and thus such cases differ] in legally important aspects from those types of injuries that present tort doctrines were designed to accommodate.'" Ducre v. Mine Safety Appliances, 573 F.Supp. 388, 391 n. 1 (E.D.La.1983), aff'd in part and rev'd in part, 752 F.2d 976 (5th Cir.), reh'g denied, en banc, 758 F.2d 651 (5th Cir.1985) (quoting Thompson v. Johns-Manville Sales Corp., 714 F.2d 581, 583-84 (5th Cir.1983), cert. denied, 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984) (Goldberg, J. dissenting) and noting that "[o]ccupational diseases of the kind at hand are particularly difficult to classify pragmatically within the structured concepts of traditional tort law").
Cole, 599 So.2d at 1065. We then went on to state that the "key relevant events giving rise to a claim in long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later." 599 So.2d at 1066 (emphasis supplied). We then described the requisite exposures for giving rise to a claim in a long-latency occupational disease case as being "significant [and] continuous." 599 So.2d at 1066.
Elsewhere in Cole, in determining the trigger or timing of insurance coverage in long-latency occupational disease cases, we adopted an exposure theory "which provides that coverage is triggered by the mere exposure to the harmful conditions during the policy period." 599 So.2d at 1076. Although we were discussing insurance coverage at that point in the opinion, we then discussed in a footnote the contraction theory set forth in Faciane, but declined to apply it to triggering insurance coverage and leaving for another day whether the contraction theory applies in determining the applicable law in an executive officer suit context. 599 So.2d at 1076, n. 54. Still, in discussing why an exposure theory was appropriate, we reasoned as follows:
First, the exposure theory comports with a literal construction of the policy language: "`[b]odily injury' should be construed to include the tissue damage which takes place upon initial inhalation of asbestos." [Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1223 (6th Cir.1980), reh'g granted in part, clarified, 657 F.2d 814 (6th Cir.)]. In so finding, the [Forty-Eight Insulations] Court relied heavily on the medical evidence, indicating that "[i]njury, in the sense that there is tissue damage, occurs shortly after the initial inhalation of asbestos fibers.... [with e]ach additional inhalation of asbestos fibers result[ing] in the buildup of additional scar tissue in the lungs." Id. at 1218. Second, under the facts, the exposure theory would maximize coverage. Id. at 1222. Third, the exposure theory honors the contracting parties' intent by providing for consistency between the insured's tort liability and the insurer's coverage: "The contracting parties would expect coverage to parallel the theory of liability." Id. at 1219. See Comment, Asbestosis: Who Will Pay The Plaintiff?, 57 Tul. L.Rev. 1491, 1506-1507 (1983).
Cole, 599 So.2d at 1076-77 (emphasis added). We then recognized there was a sound basis underlying this exposure theory for triggering coverage:
[T]he exposure theory is more accurately analyzed as positing not that each inhalation of asbestos fibers results in *1154 bodily injury, but rather that every asbestos-related injury results from inhalation of asbestos fibers. Because such inhalation can occur only upon exposure to asbestos, and because it is impossible practically to determine the point at which the fibers actually imbed themselves in the victim's lungs, to equate exposure to asbestos with "bodily injury" caused by the inhalation of the asbestos is the "superior interpretation of the contract provisions." Forty-Eight Insulations, 633 F.2d at 1223.
Cole, 599 So.2d at 1077 (quoting Commercial Union Ins. Co. v. Sepco Corp., 765 F.2d 1543, 1546 (11th Cir.1985)).
In sum, then, the court of appeal's statement in the instant case, that "exposure [to asbestos] in no way includes the concept of damage," 34,495, p. 6, 785 So.2d at 182, is not correct, as this court has previously reasoned that "significant and continuing exposure" to asbestos in long-latency occupational disease cases where the individual suffers from the disease does include a corresponding measure of injury or damage.
Adopting the rationale of Cole, we conclude that the "significant tortious exposure" theory for determining when a cause of action accrued in a long-latency occupational disease case in which the plaintiff suffers from an illness or disease is when the exposures are "significant and such exposures later result in the manifestation of damages ...." Cole, 599 So.2d at 1066. Just as the appellate court reasoned in Abadie, we hold that "tortious exposures are significant when asbestos dust has so damaged the body that the fibrogenic effects of its inhalation will progress independently of further exposure." Abadie, p. 17, 784 So.2d at 65. We agree with the Abadie court that such an application of the "significant tortious exposure" theory is a logical variation of, and not materially different from, the application of the "contraction" theory articulated in Faciane. Therefore, in order to establish when the tort cause of action accrued in a long-latency occupational disease case, wherein the plaintiff suffers from the disease, the plaintiff must present evidence that the exposures were "significant and such exposures later result[ed] in the manifestation of damages ...." Cole, 599 So.2d at 1066.
This holding neither upsets nor diminishes the basic concept that tort liability involves the balancing of competing interests. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 3, at 15 (5th ed.1984). In situations where damage does not occur until long after the alleged defendant's conduct has ended, industry, rather than the injured victims, is in a better position to bear the risk by including this liability in the costs of the product and reserving a fund for contingent liabilities. See Maraist & Galligan, Louisiana Tort Law, §§ 10-1, 10-2. At the same time, allowance of a tort action, such as Mr. Hogue's, this long after exposure does not necessarily mean that stale or lost evidence will hamper industry. Jurisprudence from other jurisdictions indicates that the quality of much of the crucial evidence in latent disease cases improves with the passage of time, because the state of scientific knowledge becomes more sophisticated at the same time that the plaintiff's illness progresses from being inherently undiscoverable to symptomatic to diagnosable. See, e.g., Wilson v. Johns-Manville Sales Corp., 684 F.2d 111, 119 (D.C.Cir.1982); Larson v. Johns-Manville Sales Corp., 427 Mich. 301, 399 N.W.2d 1, 5-6 (1986).

CONCLUSION
Applying the significant tortious exposure theory to this case, we find that *1155 the employer defendants have failed to carry their burden with respect to the motion for summary judgment. The only medical evidence presented by the defendant in this case was that the disease most likely manifested itself in July 1998 and that Mr. Hogue became disabled that same year. The employer defendants submitted no affidavits or other evidence that the disease was contracted after 1975 or that the pre-1975 excessive exposures alleged by Mr. Hogue in his petition were neither significant nor resulted in the onset of disease. Thereafter, Mr. Hogue produced his deposition testimony that he was exposed to substantial amounts of asbestos and asbestos-containing materials throughout his employment prior to 1975. He also produced the affidavit of Dr. Roggli that the pre-1975 exposures identified by Mr. Hogue related to his diagnosis of pleural mesothelioma in 1998. Accordingly, we conclude that Mr. Hogue met his burden under La.Code Civ. Proc. art. 966 of producing evidence to show that a genuine issue of material fact exists and that he would be able to satisfy his burden of proof at trial. We find that the employer defendants in this case have not carried their ultimate burden of establishing for summary judgment purposes that Mr. Hogue's cause of action accrued only after 1975, such that the employer defendants would be entitled to summary judgment and immunity from suit in tort.

DECREE
For the reasons set forth above, we reverse the lower courts' summary judgment in favor of the employer defendants and remand for further proceedings not inconsistent with our holding in this case.
REVERSED AND REMANDED.
CALOGERO, C.J., assigns additional reasons.
KIMBALL, J., dissents.
VICTORY, J., dissents and assigns reasons.
TRAYLOR, J., dissents.
CALOGERO, Chief Justice, assigns additional reasons.
In addition to the reasons assigned in the majority opinion of this court, I write separately to address an opinion recently handed down by another state's highest court with facts remarkably similar to those in the case sub judice. The Maryland Court of Appeals rejected the manifestation theory espoused by the lower courts in the present case, and adopted the significant tortious exposure theory of determining when a plaintiff's cause of action arises in a long-latency disease case. See John Crane, Inc. v. Scribner, 369 Md. 369, 800 A.2d 727 (Md.6/11/02).
In Scribner, the plaintiff developed mesothelioma as a result of exposure to asbestos contained in the defendants' products while he served in the Navy from 1971-1978; however, the plaintiff's disease did not manifest itself until 1995. Id. at 732. Under the manifestation theory, the plaintiff's cause of action would have arisen in 1995, when he was diagnosed with mesothelioma, and, thus, his damages would be subject to the statutory cap imposed by the Maryland legislature in 1986. Id. at 738. The court noted that the manifestation theory, although conceptually simple and certain, ignores the distinction between when a cause of action arises and when it accrues. Id. at 739. With a long-latency period disease, the injury will almost necessarily occur before the disease is, or as a practical matter can be, discovered. Id. at 735. "Indeed, ... the `discovery rule' itself, ... is founded on the premise that a period of time may elapse between the point at which an injury occurs *1156 and hence a cause of action based on that injury arises and the point at which the injured person may reasonably discover that injury." Id.
The Scribner court next rejected the contraction theory, which fixes the plaintiff's cause of action at the moment the disease itself first arose in the body. Id. at 740. The court noted that this theory is "impossible to apply in any uniform and rational way and necessarily engenders competing expert testimony as to the timing of an event that no one can precisely define." Id.
The court observed that the significant tortious exposure theory is both theoretically supportable and workable. Id. This approach starts with the premise that the plaintiff has established, to the satisfaction of the trier of fact, an injury proximately caused by exposure to the defendant's asbestos-containing product. Once injury and cause are established, the plaintiff must show the timing of significant exposures to asbestos. Id. at 741. Because the Scribner plaintiff established to the satisfaction of the jury that the last exposure occurred prior to July 1, 1986, the date the legislature imposed the cap on damages, the damages awarded could not be reduced under the statutory cap.
The facts of Scribner are nearly identical to those of the case at hand. Plaintiff, Mr. Hogue was exposed to the asbestos-containing materials during his employment with the defendant companies during the 1950s, 60s, and 70s. Mr. Hogue's mesothelioma did not manifest itself, however, until 1998, when the 1975 amendment to the workers' compensation laws would have precluded a tort recovery against these employers. Like the Maryland court, we hold that a plaintiff's claim arises at the time of exposure to the agent that later produced a real and diagnosable disease.
Defendants in their most recent reply brief argue that Scribner is distinguishable because all of that plaintiff's asbestos exposures occurred before the enactment of the statute, while in the present case, Mr. Hogue was exposed for some period after the effective date of the workers' compensation statute, in addition to before. However, the case is procedurally before us on a motion for summary judgment, and under the significant tortious exposure theory adopted by this court, there is a genuine issue of material fact whether Mr. Hogue's significant exposures to asbestos before 1975 later resulted in mesothelioma. If Mr. Hogue can prove significant pre-1975 exposures to asbestos, his cause of action "arose" before the 1975 amendment to the workers' compensation laws. Therefore, regardless of any post-1975 exposures, the subsequent amendments cannot retroactively deprive him of the vested property right to bring a tort action against the employer defendants.
VICTORY, J., dissenting.
I dissent from the majority's adoption of the significant exposure theory, which holds that it is possible for plaintiff to have an accrued cause of action for mesothelioma decades prior to the time he acquired the disease.
The majority's ruling ignores long-established law found in Gales v. Gold Bond Bldg. Products, Div. Of Nat. Gypsum Co., 493 So.2d 611 (La.1986), in which this Court addressed the obligations of successive employers where an employee/claimant's occupational disease resulted from 28 years of exposure to asbestos, before and after the 1975 amendments, while employed by successive employers. In determining the obligations of each of the successive employers, this Court held:
Any employer whose employment of a claimant has contributed causally to his *1157 disabling occupational disease is solidarily obligated to him fully for workers' compensation. As between successive employers contributing to an employee's disabling occupational disease, the employer during whose employment the employee was last injuriously exposed to the cause of the occupational disease is fully responsible for all workers' compensation due.
493 So.2d at 612. In its analysis, this Court in Gales cited and relied on La. R.S. 23:1031.1 as amended in 1975, even though most of Gales' exposure predated the 1975 amendment. In reaching its holding the Court said:
The occupational disease section provides that the rights and remedies granted therein to an employee or his dependent on account of an occupational disease shall be exclusive of all other rights. La. R.S. 1031.1. The section may be reasonably construed so as to incorporate the compensation compromise: the employee exchanges damage claims for compensation claims against all previous employers who contributed to his occupational disease; the previous employers strike a reciprocal bargain, and are granted immunity from tort suits (emphasis added).
Id. at 615 (citing Lowery v. McCormick Asbestos Co., 300 Md. 28, 475 A.2d 1168 (1984); Farrall v. Armstrong Cork Co., 457 A.2d 763 (Del.Super.1983)). Thus, because Gales had the right to demand performance of the compensation obligation from each previous and successive employer, this Court recognized that each previous and successive employer was entitled to tort immunity. Id.
Gales cannot be reconciled with the majority's holding in this case. According to plaintiff's theory, now adopted by the majority, he may be entitled to maintain a tort action against an employer for whom he worked prior to 1975; however, all post-1975 employers would be entitled to tort immunity. Gales rejected this result. Instead, it held that each causative employer is obligated for the compensation obligation, and, in order to maintain the necessary quid pro quo, recognized that each causative employer was immune from a tort claim.
The quid pro quo doctrine is at the heart of the analysis of the issue in this case. As so clearly pointed out in O'Regan v. Preferred Enterprises, Inc., 98-1602 (La.3/17/00), 758 So.2d 124, 139[1], where the Act provides a remedy, the immunity provisions apply and the claimant is not allowed to bring a tort action. See also Roberts v. Sewerage & Water Bd. Of New Orleans, 92-2048 (La.3/21/94), 634 So. 341, *1158 344. O'Regan held that whenever an employee is entitled to receive compensation, he is precluded from bringing a tort action against his employer:
The "compensation" for which an employee or his dependent "is entitled to" under the Act is the exclusive remedy for such injuries. La. R.S. 23:1031.1(H). Thus, injured employees are not permitted to seek and recover both compensation under the Act and damages in tort.
Id. at 138. Emphasizing the sanctity of this quid pro quo, this Court has cautioned that "[o]bviously, this compromise, in which the employer and employee each surrender valuable rights, could not be effectuated if either party were free to ignore the Act whenever it would be to his advantage to do so." Roberts v. Sewerage & Water Board, supra at 344 (citing Malone & Johnson, Workers' Compensation, § 4.6 (2d 1980)). In this case, because the Act provides a remedy when the employee becomes disabled, the immunity provisions of the Act also apply. See Roberts, supra at 344 ("[o]bviously, the same principles which decide the question of whether compensation is payable, also are used to decide the question of whether a tort remedy must be denied"). As Malone and Johnson have pointed out, "[w]ith the 1975 amendments providing general occupational disease coverage under the Act, however, there would remain no occasion to litigate such matters in tort proceedings against the employer." Malone & Johnson, § 361.[2]
In sum, under well-established law, because this plaintiff clearly has a remedy in workers' compensation for his occupational disease, he is precluded from seeking recovery in tort. The majority, by ignoring these principles, strains mightily to secure a tort remedy for plaintiff. This attempt *1159 creates serious problems for this plaintiff and all similarly situated plaintiff's. I will point out a few of them.
One problem, which the majority clearly recognizes as so serious that it addresses the issue in dicta although it is not yet before us in this case, is the issue of prescription. Obviously, if the cause of action accrues upon "significant exposure" to asbestos, prescription begins to run at that time.[3] The majority attempts to solve this problem in advance by stating, in dicta, that the fourth category of contra non valentem would apply to suspend the running of prescription in this case. The majority, however, misinterprets the law in this area by analogizing this case to the case of Owens v. Martin, 449 So.2d 448 (La.1984), which is distinguishable on a crucial point, that is, Owens predicated the running of prescription and the corresponding application of contra non valentem on the plaintiff being able to prove that he contracted asbestosis, and thus suffered damages, at which time contra non valentem could suspend the running of prescription.[4] In this case, the plaintiff did not suffer any cognizable damages at the time of the "significant exposures." For the same reasons that plaintiff's cause of action does not accrue at that time, it appears that prescription cannot be suspended by the application of contra non valentem. This "discovery" type of contra non valentem has never been applied to suspend prescription between the time a plaintiff is subjected to conduct that could, or could not, later cause him damage and the time that the actual damage occurs. Further, the damage that the *1160 plaintiff incurs but has not yet discovered, giving rise to a cause of action, the running of prescription and the possible suspension of prescription, necessarily has to be the same damage which the plaintiff later discovers and for which he seeks recovery. Here, the damage that the majority theorizes that the plaintiff may have suffered at the time of exposure is not the same as the damage plaintiff suffered much later and for which he is now seeking to recover, i.e., mesothelioma. In addition, it appears farfetched to suggest that prescription can be suspended by contra non valentem for the amount of time involved in this longterm latency disease case, which will necessarily have to be longer that 23 years (before the 1975 amendments), and possibly up to 40 years, under the majority's holding. No Louisiana court has allowed prescription to be suspended for that long in a tort case. Even in the field of medical malpractice, where the fourth category of contra non valentem is most applicable, the legislature itself has cut off the "discovery" period at three years. La. R.S. 9:5628.
Another problem is the majority holding that a party's cause of action can accrue before he has a right to assert it. If the plaintiff had tried to bring his cause of action for mesothelioma at the time the majority says it accrued, i.e. upon significant exposure to asbestos which according to the majority could have occurred over 27 years ago (prior to 1975), his case would have been thrown out of court. While it may be true that a cause of action can arise before the party sustains all of the damages occasioned by the defendant's negligence, Harvey v. Dixie Graphics, 593 So.2d 351 (La.1992), the party still has to have some cognizable, as opposed to speculative, damages before his cause of action accrues.
This brings up the burden of proof problem created by the majority's holding. Under its holding, "tortious exposures are significant when asbestos dust has so damaged the body that the fibrogenic effects of its inhalation will progress independently of further exposure." Op. at 1154 (citing Abadie v. Metropolitan Life Ins. Co., 00-344 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, writ denied, 01-1543 (La.12/14/01), 804 So.2d 643). The majority reasons that "such an application of the `significant tortious exposure' theory is a logical variation of, and not materially different from the application of the `contraction' theory articulated in Faciane," a theory which the majority rejected earlier in the same opinion. Op. at 1154. In Cole itself, the case in which the majority relies on for its adoption of the "significant exposure" test, this Court criticized the "contraction" theory as being "fraught with difficulties" because "it is extremely difficult to accurately fix the point in time at which the disease is contracted." 599 So.2d at 1076, n. 54; see also Malone & Johnson, supra, § 219. The majority, instead of moving in the direction in which it is easier to say that a plaintiff had cognizable damages because such damages have manifested themselves, moves in the wrong direction so that pinpointing the time when cognizable damages occur is even more speculative than the contraction theory previously criticized by this Court.
Another problem with the majority's theory that a cause of action accrues at the time of significant exposure to asbestos is that it is not based on the realities of medical science. As stressed by the court of appeal, it is clear that the vast majority of persons who are exposed to asbestos or asbestos-containing products do not develop mesothelioma, or any other asbestos-related disease. Further, even if a person is exposed to asbestos which causes changes in the pleural membrane, *1161 that does not mean that the person will ever suffer an asbestos-related disease as a result. In fact, "the vast majority of new asbestos claims are filed by unimpaired claimants, defined as `people who have been exposed to asbestos, and who (usually) have some marker of exposure such as changes in the pleural membrane covering the lungs, but who are not impaired by an asbestos-related disease and likely never will be.'" Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, 54 Baylor Law Review, 331, 342 (2002). Thus, at the time the majority holds that the cause of action accrues, it is pure speculation as to whether a person will ever actually develop an asbestos-related disease. As the Supreme Court of Pennsylvania has held, asymptomatic pleural thickening, unaccompanied by physical impairment, it not a compensable injury that gives rise to a cause of action, and that the discovery of pleural plagues or a nonmalignant, asbestos-related lung pathology does not trigger the statute of limitations with respect to an action for a later, separately diagnosed disease of lung cancer. Simmons v. Pacor, Inc., 543 Pa. 664, 674 A.2d 232, 237 (1996). Further, mesothelioma is unlike asbestosis or silicosis, in which the scarring of lung tissues takes place coincident with exposure and could continue to progress with subsequent exposures. As plaintiff's doctor has previously testified, malignancies such as lung cancer and mesothelioma will not occur in any form for many years and do not exist, even in microscopic form, for more than approximately ten years prior to their diagnosis. Furthermore, once a tumor starts to grow, subsequent exposures are irrelevant.
The majority attempts to solve this problem by establishing a new and separate rule for plaintiff's who later get a serious disease, such as mesothelioma. The majority has to establish this separate rule because most persons who have merely been exposed (or even significantly exposed) to asbestos will never acquire an asbestos-related disease. Presumably then, according to the majority's reasoning, these persons who have suffered the identical exposures but who never acquire an asbestos-related disease have no accrued cause of action. Thus, the majority's separate rule for people who later do acquire a disease is simply an example of "Monday morning quarterbacking," all to avoid the compensation remedy established by the legislature.
In conclusion, in spite of the problems inherent in long-term latency diseases, such as mesothelioma, see Cole, they provide no justification for retreating from the firmly established law in this state that in order for a tort cause of action to accrue, the plaintiff must incur cognizable damages. Therefore, just as in Walls v. American Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262, this Court should again refuse "to require all long-latency occupational disease cases to be governed by the law in effect on the date the victim was exposed to the disease causing agent." See Walls, supra at 1270. I would adopt the manifestation theory to this long-term latency disease case, as it is the theory most easily applied, and which most closely aligns with the principles behind the workers' compensation scheme, while at the same time comporting with the established tort law requirements of fault, causation, and damages. Further, it avoids the serious problems that result with the adoption of the significant exposure theory.
For all of the above reasons, I respectfully dissent.
NOTES
[*] Judge James C. Gulotta, retired, assigned as Associate Justice ad hoc, sitting for Associate Justice John L. Weimer, recused.
[1] Amendments to these two statutes since 1975 and 1976 are not relevant to our decision today.
[2] The plurality opinion in O'Regan attempted to make a distinction between those situations in which an event or injury is not "covered" by the workers' compensation law, and thus a tort action would not be barred, and those situations in which the event or injury is "covered" by the workers' compensation law but the claimant is unsuccessful in obtaining benefits because of failure to prove some other part of a prima facie case. See Malone & Johnson, Workers' Compensation Law and Practice, 14 Louisiana Civil Law Treatise § 366, p. 27 (West Supp.2001). Nowhere in O'Regan did the plurality dispense with settled law that due process precludes subsequent divestiture by legislative action of an accrued property right in the occupational disease context.
[3] We described that inquiry as follows:

La. Civ.Code Art. 6 requires that we engage in a two-fold inquiry. First, we must ascertain whether in the enactment the legislature expressed its intent regarding retrospective or prospective application. If the legislature did so, our inquiry is at an end. If the legislature did not, we must classify the enactment as substantive, procedural or interpretive. See Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167, 182 (5th Cir.), reh'g denied, 920 F.2d 259 (5th Cir.1990), citing Ardoin v. Hartford Accident & Indem. Co., 360 So.2d 1331, 1338-39 (La.1978).
Cole, 599 So.2d at 1063. "Substantive laws," for purposes of determining whether a law should be applied retroactively, are those which establish new rules, rights, and duties, or change existing ones. Aucoin v. State of Louisiana, Through Dept. of Transp. and Dev't, 97-1938, 97-1967 (La.4/24/98), 712 So.2d 62, 67.
[4] We stated in Cole:

Generally, the determinative point in time separating prospective from retroactive application of an enactment is the date the cause of action accrues. Once a party's cause of action accrues, it becomes a vested property right that may not constitutionally be divested. Crier v. Whitecloud, 496 So.2d 305, 308 (La.1986); Faucheaux v. Alton Ochsner Medical Foundation Hospital and Clinic, 470 So.2d 878, 879 (La.1985); Lott v. Haley, 370 So.2d 521, 524 (La.1979); Burmaster v. Gravity Drainage District No. 2, 366 So.2d 1381, 1387 (La.1978); Marcel v. Louisiana State Department of Public Health, 492 So.2d 103, 109-10 (La.App. 1st Cir.), writ denied, 494 So.2d 334 (La.1986). Stated differently, "statutes enacted after the acquisition of such a vested property right ... cannot be retroactively applied so as to divest the plaintiff of his vested right in his cause of action because such a retroactive application would contravene the due process guaranties." Faucheaux, 470 So.2d at 879.
599 So.2d at 1063-64.
The Cole court also recognized that "it is well settled that [the] 1976 amendment prohibiting executive officer suits cannot be retroactively applied to divest parties whose causes of action accrued before the amendment was enacted." 599 So.2d at 1064, n. 16 (collecting cases and authorities). See also Gautreaux v. Rheem Mfg. Co., 96-2193 (La. App. 4 Cir. 12/27/96), 694 So.2d 977 (holding that asbestos was not a listed substance in La.Rev.Stat. 23:1031.1 prior to 1975 such that, when it caused disease, it was covered by workers' compensation).
[5] The issue presently before us is one of whether the tort cause of action accrued prior to the effective date of legislation purporting to eliminate the claim, whereas the issue of the accrual date for the tort cause of action often arises in the context of prescription. As Francis E. McGovern notes in Toxic Substances Litigation in the Fourth Circuit, 16 U. of Richmond L.Rev. 247, 254-55:

The most frequently litigated issue in [the area of toxic substances litigation] has involved the interpretation of the commencement time for tort statutes of limitations. Most tort statutes of limitation begin to run at the accrual of the cause of action. "Accrual" has been defined to mean: when a duty is breached; when a person is first injured; when a person is last injured; when a person is, or should be, aware of an injury; when a person is aware of the cause of injury; when a person is aware of the defendant's conduct; when a person is aware of a causal connection between an injury and a defendant; when a person is aware that there is a lawsuit.
[6] In Bourgeois I, the plaintiffs sought expenses for medical monitoring after exposure to asbestos or asbestos-containing materials. The lower courts, after finding that the plaintiffs had not alleged any present physical damage and, thus, had failed to allege damage so as to have stated a cause of action in tort, held that the plaintiffs could not institute and sustain a claim against the defendants "unless and until they manifest an exposure-related illness or disease." 97-3188, p. 2, 716 So.2d at 357. Justice Marcus writing for a unanimous court reversed the lower courts' judgments, reasoning that "asbestos ... affects the body in ways that often do not become manifest for many years," and that, although "asbestos exposure is an accident almost always without impact, ... it is still an accident that can have consequences every bit as real as those sustained in a head-on collision." Id., p. 5, 716 So.2d at 358 (citations omitted). Justice Marcus went on to set forth seven criteria for determining whether the cost of medical monitoring is a compensable item of damage under La. Civ.Code art. 2315, including "significant exposure to a proven hazardous substance." Id., pp. 8-11, 716 So.2d at 360-62.
[7] As this Court stated in Corsey v. State of Louisiana, through the Dept. of Corrections, 375 So.2d 1319, 1321 (La.1979), the jurisprudence has recognized the doctrine of contra non valentem as "a limited exception where in fact and for good cause a plaintiff is unable to exercise his cause of action when it accrues." As applicable herein, contra non valentem applies "where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." Whitnell v. Menville, 540 So.2d 304, 308 (La.1989).

To illustrate how the timing of contra non valentem works conceptually, reference is made to the following language footnoted in Owens, a case involving a worker who handled large quantities of asbestos that exposed him to asbestos dust and fibers:
[C]ontra non valentem applies to suspend the running of prescription on a cause of action already accrued. Before prescription can run or be suspended, there must be a cause of action, that is, the elements of a negligence cause of action (fault, causation and damages) must exist. There is no need to invoke the doctrine where the damage does not occur until some time after the negligent act. In that case, the code itself provides that prescription does not commence until the damage is sustained. [La. Civ.Code art.] 3492 ([La Civ.Code arts.] 3536-37 prior to January 1, 1984); Jones v. Texas & Pacific Ry. Co., [125 La. at 547, 51 So. at 583-84]; Lucas v. Commercial Union Insurance Co., [198 So.2d 560, 564-65 (La. App.1967)].
Owens, 449 So.2d n. 4 at 451 (emphasis added).
Applying that analysis in Owens, the Court further observed:
In the present case, it is possible that Mr. Owens suffered damage prior to 1976; yet, even though "reasonably diligent," he did not become aware of his cause of action against defendants until the disease was diagnosed in 1980. In such a case, contra non valentem would apply to suspend the running of prescription during the period between the initial damages and the diagnosis.
Id.
If manifestation of the disease triggers accrual of the injured person's tort claim, such a benchmark would nullify the application of contra non valentem and would ignore this Court's observation that "contra non valentem applies to suspend the running of prescription on a cause of action already accrued." Owens, 449 So.2d at 451 n. 4.
[8] "Insidious disease cases are fundamentally different from ... snapshot torts," i.e., those instances where a plaintiff's injuries occurred within a short period of time. Michael D. Green, Paradox of Statutes of Limitations in Toxic Substances Litigation, 76 Cal. L.Rev. 965, 972-73 (1988). The most significant parameter that distinguishes toxic substance torts is the lengthy latency periods from exposure to clinical manifestation of the disease. Green at 973.
[9] The United States Supreme Court has also recognized that some of the traditional rationales for statutes of limitation cannot be reasonably applied to latent disease cases. Urie v. Thompson, 337 U.S. 163, 169-70, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). It held that without the use of some methodology to defer the accrual of causes of action in latent disease cases, the use of traditional statutes of limitations to bar toxic tort claims would render the tort cause of action "only a delusive remedy. It would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, [the plaintiff] was charged with knowledge of the slow and tragic disintegration of his [body]." Urie, 337 U.S. at 169, 69 S.Ct. 1018.
[1] In O'Regan, this Court found that the plaintiff was not precluded from bringing an action in tort because the presumption of La. R.S. 23:1031.1(D), which provides that any occupational disease contracted by an employee while performing work for an employer in which he has been engaged for less than 12 months is presumed to be non-occupational, places the employee outside of the exclusivity provisions of the Act. However, in O'Regan, this Court was careful to distinguish between "injuries which do not come within the Act's coverage provisions and injuries which are covered, but for which no compensation is payable." 758 So.2d at 137. The injuries in O'Regan were the type which this Court found did not come within the coverage provisions of the Act. Id. at 138. This Court also was careful to distinguish the type of case presented in O'Regan, in which the employee could sue in tort, from "cases where a covered claim fails because the employee does not meet his burden of proof as to a component of his case other than for basic coverage of the Act." Id. Thus, an employee who suffers from an occupational disease covered under the Act, but has not yet become disabled, is the type of plaintiff who would be precluded from bring a tort action under O'Regan, even though he might not yet be entitled to workers' compensation benefits, because he has a "covered claim."
[2] The date of the disability, not the date of exposure, has been found by this Court to determine the applicable workers' compensation law. In Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042 (La.1982), the plaintiff was exposed to silica at his workplace from 1964-1979, and was diagnosed with silicosis in 1979. Under pre-1975 workers' compensation law, he would have been classified as permanently and totally disabled, but under post-1975 law, he would have been classified as partially disabled. This Court applied post-1975 law to determine the character of his disability. 411 So.2d at 1045-1048. In Bynum v. Capital City Press, Inc., 95-1395 (La.7/2/96), 676 So.2d 582, we held that the prescriptive period in a workers' compensation case does not begin to run until a disease has manifested itself, the employee has become disabled from working as a result of the disease, and the employee knows or has reasonable grounds to believe the disease is occupationally related.

Courts of appeal have reached the same conclusion. In White v. Johns-Manville Sales Corp., 416 So.2d 327, 331 (La.App. 5 Cir. 1982), the plaintiff was exposed to asbestos from 1948-1980, and was diagnosed with asbestosis in 1980. The court held that "after analysis of the occupational disease provision, La. R.S. 23:1031.1 and occupational disease cases, we have come to the conclusion that the date of disability is the correct time in which to determine the compensation rate." 416 So.2d at 331. Finally, two appellate court cases faced the issue of the applicability of the 1990 amendment to La. R.S. 23:1035.2, which removes the jurisdiction of Louisiana for cases covered by the Longshoreman's and Harbor Worker's Compensation Act, or the pre-act law, which allowed workers the choice of federal or state compensation. Smith v. Gretna Mach. and Iron Works, 94-369 (La.App. 5 Cir. 11/16/94), 646 So.2d 1096, and Dempster v. Avondale Shipyards, 94-156 (La.App. 5 Cir. 9/27/94), 643 So.2d 1316, writ denied, 94-2645 (La.1/27/95), 649 So.2d 380. In both cases, the majority of the employees' asbestos exposure occurred prior to 1990, but the employees did not become disabled from an occupational disease until after 1990. The courts held that the relevant date for determining a claim in workers' compensation is the date that the worker becomes disabled due to his condition, which in these cases resulted in the application of post-1990 workers' compensation law. 646 So.2d at 1097, 643 So.2d at 1318.
[3] It is for this reason that the vast majority of jurisdictions that have considered the issue have adopted the manifestation theory of recovery or some variation of the "discovery rule." See e.g., Bartley v. Euclid, Inc., 158 F.3d 261 (5th Cir.1998); Aparicio v. Norfolk & W. Ry., 84 F.3d 803 (6th Cir.1996); Tolston v. National R.R. Passenger Corp., 102 F.3d 863 (7th Cir.1996); Fusco v. Johns-Manville Products Corp., 643 F.2d 1181 (5th Cir.1981); Clutter v. Johns-Manville Sales Corp., 646 F.2d 1151 (6th Cir.1981); Hyer v. Pittsburgh Coming Corp., 790 F.2d 30 (4th Cir.1986); Keith v. U.S. Airways, Inc., 994 F.Supp. 692 (M.D.N.C.1998); DeHague v. Burlington N.R. Co., 678 F.Supp. 215 (S.D.Iowa 1988); Corrigan v. Burlington N.R., Inc., 612 F.Supp. 665 (D.C.Minn.1985); Newton v. Southern Wood Piedmont Co., 163 F.R.D. 625 (S.D.Ga.1995); Castorina v. Lykes Bros. S.S. Co., 578 F.Supp. 1153 (S.D.Tex.1984); Insurance Co. Of North America v. Forty-Eight Insulations, Inc., 451 F.Supp. 1230 (E.D.Mich.1978); Fearson v. Johns-Manville Sales Corp., 525 F.Supp. 671 (D.C.Dist.Col.1981); Sopko v. Dowell Schlumberger, Inc., 21 P.3d 1265 (Alaska 2001); Gilcrease v. Tesoro Petroleum Corp., 70 S.W.3d 265 (Tex.App.San Antonio 2001); Velasquez v. Fibreboard Paper Products, 97 Cal.App.3d 881, 159 Cal.Rptr. 113 (1st Dist.1979); Bendix Corp. v. Stagg, 486 A.2d 1150 (Del.Sup.1984); Sheppard v. A.C. & S. Co., 498 A.2d 1126 (Del.Super.1985); Stagg v. Bendix Corp., 472 A.2d 40 (Del.Super.1984), aff'd 486 A.2d 1150; McDaniel v. Johns-Manville Sales Corp., 542 F.Supp. 716 (N.D.Ill.1982); Morris v. Dines Mining Co., 174 Kan. 216, 256 P.2d 129 (1953); Miller v. Beech Aircraft Corp., 204 Kan. 184, 460 P.2d 535 (1969); Louisville Trust Co. v. Johns-Manville Products Corp., 580 S.W.2d 497 (Ky.1979); Woessner v. Johns-Manville Sales Corp., 576 F.Supp. 596 (E.D.La.1984); Watkins v. J. Ray McDermott, Inc., 466 So.2d 636 (La.App. 5 Cir.1985); Devlin v. Johns-Manville, 202 N.J.Super. 556, 495 A.2d 495 (1985); see also 1 A.L.R.4th 117 (citing numerous other state court cases).
[4] As even the majority recognizes:

Contra non valentem applies to suspend the running of prescription on a cause of action already accrued. Before prescription can run or be suspended, there must be a cause of action, that is, the elements of a negligence cause of action (fault, causation and damages) must exist. There is no need to invoke the doctrine where the damage does not occur until some time after the negligent act. In that case, the code itself provides that prescription does not commence until the damage is sustained.
Op. at 1149, n. 7 (citing Owens, 449 So.2d at 451, n. 4) (emphasis added).